ORIGINAL

1   Stephen A. Tuggy (Cal. Bar No. 120416)
    Stephen.Tuggy@HellerEhrman.com
2   Kirk Hornbeck (Cal. Bar No. 241708)
    Kirk.Hornbeck@HellerEhrman.com
3   HELLER EHRMAN LLP
    333 South Hope Street, 39th Floor
4   Los Angeles, California  90045
    Telephone: (213) 689-0200
5   Fax: (213) 614-1868

6   Lawrence A. Hobel (Cal. Bar No. 73364)
    Lawrence.Hobel@HellerEhrman.com
7   HELLER EHRMAN LLP
    333 Bush Street
8   San Francisco, California 94104
    Telephone: (415) 772-6000
9   Fax: (415) 772-6268

10  Attorneys for Intervening Applicant

11  Aerojet-General Corporation

12  Additional Parties and Counsel

13  Listed on Signature Pages

14

15                 UNITED STATES DISTRICT COURT

16                 CENTRAL DISTRICT OF CALIFORNIA

17

18  UNITED STATES OF AMERICA and          Case No. CV-07-06873 ABC
    CALIFORNIA DEPARTMENT OF              (RCx)
19  TOXIC SUBSTANCES CONTROL,

20             Plaintiffs,

21         v.                             **MEMORANDUM OF POINTS
                                          AND AUTHORITIES IN
22  ANDRUSS FAMILY TRUST, et al.,         SUPPORT OF MOTION TO
                                          INTERVENE**
23             Defendants.
                                          Date:    April 14, 2008
24                                        Time:    10:00 a.m.
                                          Dept.:   Courtroom 680
25                                        Judge:   The Honorable
                                                   Audrey B. Collins
26

27

28

---

A/72454362.1

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................ 1

II.     BACKGROUND ........................................................................................ 2

        A.      The Group Of 13 Agreement In 2002 ..................................... 4

        B.      The SEMOU Plaintiffs' Lawsuit And Settlement Efforts ................... 4

        C.      The EPA's Proposed Consent Decree.................................... 6

III.    ARGUMENT ........................................................................................ 8

        A.      Applicants Are Entitled To Intervention As A Matter Of Right ........ 8

                1.      Applicant's Motion For Intervention Is Timely ...................... 10

                2.      Applicants Have Legal Interests That Support
                        Intervention.................................................................... 11

                        a.      Applicants' Interest In A Fair And Reasonable
                                Consent Decree Is Sufficient For Intervention.............. 12

                                (1)     It Is Neither Fair Nor Reasonable To Shift
                                        Allocation Of Orphan And Fugitive Shares
                                        From The Group Of 13 To Non-Yet-Settled
                                        Parties ......................................................... 13

                                (2)     EPA Has Not Yet Provided Sufficient
                                        Information To Determine Whether The
                                        Group Of 13's Allocation Is Fair And
                                        Reasonable .................................................... 14

                                (3)     The EPA's Failure To Assign Orphan
                                        Shares To The Group of 13 And To
                                        Adequately Support Its Allocation Directly
                                        Affects Applicants' Interests............................. 15

                        b.      Applicants' Interest In Protecting Their CERCLA
                                Contribution Rights Is Sufficient For Intervention ....... 16

                3.      A Good Faith Settlement Hearing Is Not A Sufficient
                        Forum For Applicants To Adequately Protect Their
                        Interests From Being Impaired .............................................. 19

                4.      The EPA Cannot Show That Applicants' Interests Are
                        Adequately Protected By Existing Parties............................... 21

        B.      In The Alternative, The Court Should Allow Permissive
                Intervention ............................................................................... 22

IV.     CONCLUSION ........................................................................................ 23

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A/72454362.1

# TABLE OF AUTHORITIES

Page

## Cases

*Arakaki v. Cayetano,*
  324 F.3d 1078 (9th Cir. 2003)............................................. 12

*California Dep't of Toxic Substances Control v. Commercial Realty
  Projects, Inc.,*
  309 F.3d 1113 (9th Cir. 2002) ............................................. 9

*California ex rel. Lockyer v. United States,*
  450 F.3d 436 (9th Cir. 2006)............................................. 12

*Charter Tp. of Oshtemo v. American Cyanamid Co.,*
  898 F. Supp. 506 (W.D. Mich. 1995)................................. 14

*County of Fresno v. Andrus,*
  622 F.2d 436 (9th Cir. 1980)........................................ 12, 21

*Donnelly v. Glickman,*
  159 F.3d 405 (9th Cir. 1998) ............................................. 9

*In re Sierra Club,*
  945 F.2d 776 (4th Cir. 1991)............................................. 17

*SC Holdings, Inc. v. A.A.A. Realty Co.,*
  935 F. Supp. 1354 (D.N.J. 1996)....................................... 14

*Tech-Bilt, Inc. v. Woodward-Clyde & Assoc.,*
  38 Cal. 3d 488 (1985)....................................................... 20

*United States ex rel. McGough v. Covington Techs. Co.,*
  967 F.2d 1391 (9th Cir. 1992)........................................ 9, 10

*United States v. Acorn Eng'g Co.,*
  221 F.R.D. 530 (C.D. Cal. 2004)....................................... 17

*United States v. Acton Corp.,*
  131 F.R.D. 431 (D.N.J. 1990) ........................................... 17

*United States v. Alcan Aluminum, Inc.,*
  25 F.3d 1174 (3rd. Cir. 1994)........................................... 10

*United States v. Cannon Eng'g Corp.,*
  720 F. Supp. 1027 (D. Mass. 1989)................................... 19

*United States v. ExxonMobil Corp.,*
  No. 07-00060, 2007 WL 4563490 (D.N.H. Dec. 20, 2007)...... 10, 17, 18, 20, 22

*United States v. Fort James Operating Co.,*
  313 F. Supp. 2d 902 (E.D. Wis. 2004) ............................... 15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A/72454362.1

TABLE OF AUTHORITIES
(continued)

Page

*United States v. Montrose Chem. Corp. of Cal.,*
    50 F.3d 741 (9th Cir. 1995) ................................................................ 12, 13, 19

*United States v. Union Electric Co.,*
    64 F.3d 1152 (8th Cir. 1995) ........................................... 12, 16, 17, 18, 21

## Statutes

42 U.S.C. § 9613(f)(1) ........................................................................... 18

42 U.S.C. § 9613(f)(2) ........................................................................... 18

42 U.S.C. § 9613(i) ............................................................................. 1, 8

42 U.S.C. § 9622(d)(2) ........................................................................... 22

## Other Authorities

72 Fed. Reg. 63185 (Nov. 8, 2007) ......................................................... 6

## Rules

Fed. R. Civ. P. 24(a) ............................................................... 1, 9, 10, 23

Fed. R. Civ. P. 24(b) ................................................................. 1, 22, 23

Fed. R. Civ. P. 24(b)(2) ......................................................................... 22

Fed.. R. Civ. P. 24(a)(2) ............................................................. 1, 8, 9, 21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A/72454362.1

1    Applicants respectfully submit this Motion to Intervene under Federal Rules
2    of Civil Procedure 24(a)(2) and 24(b), and Section 113(i) of the Comprehensive
3    Environmental Response, Compensation and Liability Act ("CERCLA"), 42
4    U.S.C. § 9613(i).[1]

5    **I.    INTRODUCTION**
6        The Environmental Protection Agency ("EPA") filed this CERLCA action
7    against thirteen of over sixty potentially responsible parties ("PRPs") in the South
8    El Monte Operable Unit (the "SEMOU"). Applicants are parties that the EPA has
9    deemed to be PRPs, but that the EPA did not name as defendants. The EPA has
10   lodged a Consent Decree purportedly settling EPA's claims against the thirteen
11   defendants (the "Group of 13") and has given notice that it intends in due course to
12   move this Court to enter the Consent Decree. Applicants seek to intervene so they
13   have standing to oppose the EPA's motion. Applicants are filing this motion now
14   – in advance of the filing of EPA's motion to enter the Consent Decree – so there is
15   no suggestion of undue delay or prejudice to the EPA or the Group of 13.

16       Applicants have standing to intervene because the disposition of the EPA's
17   motion to enter the Consent Decree could impair two significant interests of the
18   Applicants. If entered, the Consent Decree would impair Applicants' interests in
19   (1) a settlement that fairly and reasonably allocates purported liability for
20   contamination in the SEMOU among all the settling PRPs; and (2) Applicants'
21   rights to contribution under CERCLA. Applicable law recognizes each of these
22   interests as sufficient to confer a right to intervene under 42 U.S.C. § 9613(i)
23   (CERCLA intervention), as well as under Federal Rule of Civil Procedure 24(a)
24   (intervention as a matter of right).

25   ──────────────
26   [1] Applicants are Aerojet-General Corporation, TDY Industries, Inc., Astro Seal,
     Inc., Mary Brkich, Joan Linderman, M&T Company, Plastic Engineered
     Components, Inc., Don Tonks, Roy Tonks, Tonks Properties, Mammoet Western,
27   Inc., Time Realty Investments, Inc., Barry Zwahlen, Quaker Chemical Corporation,
     Multi Chemical Products, Inc., Del Ray Industrial Enterprises, Inc., Art Weiss, Inc.
28   and Art Weiss (collectively, "Applicants").

1    In the event this Court grants Applicants' motion to intervene and the EPA

2    files its motion to enter the Consent Decree, Applicants will oppose the EPA's

3    motion on the grounds that the Consent Decree (1) is not based on a fair or

4    reasonable allocation of purported liability among the PRPs, and (2) improperly

5    extinguishes Applicants' contribution claims against the members of the Group of

6    13. Specifically, the Consent Decree is based on unfair and unreasonable

7    allocations because it fails to allocate to the Group of 13 any part of the liability

8    attributable to a large number of PRPs who the EPA has known for some time will

9    *not* pay their allocable share of liability, either because they lack sufficient funds to

10   pay or they cannot be located. If the Consent Decree is approved, the EPA would,

11   without justification, attempt to shift the entire burden of this unfunded share away

12   from the Group of 13 and potentially onto Applicants. Moreover, the EPA's

13   request that this Court enter the Consent Decree would be procedurally unfair

14   because the EPA has not produced sufficient evidence to allow Applicants or this

15   Court to scrutinize whether the percentage of liability EPA has concluded should

16   be allocated to the Group of 13 is fair or reasonable.

17   Finally, in light of the fatal deficiencies in the EPA's allocations of

18   purported liability to the PRPs, the Consent Decree unfairly extinguishes

19   Applicants' rights to contribution as against the members of the Group of 13. In a

20   separate but related action before this Court, water purveyors in the SEMOU have

21   sued the Applicants and other PRPs for the costs of treating contaminated

22   groundwater. Applicants, in turn, filed claims for contribution against the

23   members of the Group of 13, among others. Applicants seek to intervene here to

24   preserve these contribution claims.

25   **II.   BACKGROUND**

26   The EPA has identified the members of the Group of 13, Applicants, and

27   many other parties as PRPs for groundwater contamination in the SEMOU located

28   in South El Monte, California. The SEMOU is one of five operable units that

1   make up the San Gabriel Valley Superfund Site. Investigation and remediation at

2   the SEMOU have been ongoing since 1984 when the site was placed on the

3   National Priorities List.

4        In September 2000, the EPA issued an Interim Record of Decision

5   ("IROD"), adopting a remedy for cleaning up volatile organic compounds

6   ("VOCs") in the SEMOU. The remedy consists primarily of pumping and

7   treatment of contaminated water by certain water purveyors and the San Gabriel

8   Valley Water Quality Authority (the "WQA"). These water purveyors were to

9   pump and clean the water at certain rates, and then sell the treated water to their

10  customers at the profit level allowed by the WQA. The WQA was to oversee and

11  coordinate the implementation of the remedy. Tuggy Decl. Ex. B.

12       In August 2003, the EPA issued a Unilateral Administrative Order ("UAO")

13  to require the SEMOU PRPs to prepare a remedial design for the remedy described

14  in the IROD. The UAO further provided that the PRPs were to implement the

15  design by performing the remedial action or by negotiating a settlement with the

16  water purveyors who already were pumping and treating the groundwater. Tuggy

17  Decl. Ex. C.

18       Shortly thereafter, due to perchlorate detections in a handful of wells in the

19  SEMOU, the EPA modified the remedy. In 2005, the EPA issued an Explanation

20  of Significant Differences ("ESD") to supplement the IROD and address

21  perchlorate contamination. Tuggy Decl. Ex. D. While EPA acknowledges that

22  none of the PRPs is a known source of perchlorate in the SEMOU, and in fact has

23  admitted there is no known source of perchlorate in the SEMOU, it has

24  nevertheless argued that perchlorate treatment is required by state law to effectuate

25  the final remedy and that the PRPs for VOC contamination should be held

26  responsible for those costs. EPA has estimated cleanup costs at $87 million and it

27  is this amount that serves as the basis for the Consent Decree that the EPA will

28  seek to have entered in this case.

---

3

### A.   The Group Of 13 Agreement In 2002

The water purveyors have alleged that chemicals released by the PRPs contaminated the groundwater they pump for sale causing them to incur substantial costs to treat the water before it could be distributed.  Beginning before 2002, these water purveyors threatened to sue the PRPs for these costs.  In response to those threats, the Group of 13 entered into a limited settlement and funding agreement with the water purveyors and WQA in 2002 (the "G-13 Agreement").  Tuggy Decl. Ex. F.

Under the G-13 Agreement, the Group of 13 agreed to pay the water purveyors $4.7 million in exchange for a standstill under which the water purveyors agreed not to bring suit against the Group of 13 for VOC cleanup costs during a limited period.  The standstill period was defined as the period that the $4.7 million was being used by the water purveyors for VOC cleanup purposes plus two years.  Tuggy Decl. Ex. F, at paragraph 5.  So long as the water purveyors had attempted to obtain monies from other PRPs for VOC cleanup costs, the water purveyors could look to the Group of 13 for further payments after the standstill period.  *Id.*  The EPA was not a party to the G-13 Agreement in any way.

### B.   The SEMOU Plaintiffs' Lawsuit And Settlement Efforts

In late 2002, the water purveyors and the WQA (collectively the "SEMOU Plaintiffs")[2] sued Applicants, among other parties, for CERCLA cost recovery and other state law claims (the "SEMOU Litigation").[3]  The SEMOU Plaintiffs alleged that the defendants were responsible for groundwater contamination resulting from the defendants' ownership or operations of facilities within the SEMOU. Consistent with the G-13 Agreement, the SEMOU Plaintiffs did not sue the

---

[2] The SEMOU Plaintiffs include: City of Monterey Park, San Gabriel Valley Water Company, the Southern California Water Company and San Gabriel Basin Water Quality Authority.
[3] The SEMOU Litigation includes C.D Cal. Civil Case No. CV-02-5909, No. CV-02-6346, No. CV-02-4565 and No. CV-02-6340.  All are pending before this Court and are stayed for ongoing mediation discussions.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE
A/72454362.1

1   members of the Group of 13.

2       In April 2004, certain SEMOU Litigation defendants filed third-party

3   complaints against the members of the Group of 13, other PRPs not sued by the

4   SEMOU Plaintiffs, and the SEMOU Plaintiffs themselves.  The third-party

5   complaints alleged that the SEMOU Plaintiffs, along with other third parties

6   contributed to groundwater contamination in the SEMOU.  Included among these

7   third party claims were Applicants' contribution claims against the members of the

8   Group of 13.

9       In August 2004, this Court appointed a mediator in the SEMOU Litigation

10  and required all parties to make use of his services for their disputes.  On

11  October 12, 2004, at the mediator's request, the Court stayed all discovery and

12  motion deadlines (with certain exceptions) to allow the parties to mediate.  The

13  stay currently runs through May 30, 2008.

14      It appears that the mediator presided over the negotiations that led to the

15  terms of the Consent Decree.  While Applicants have been anxious to participate in

16  substantive negotiations from the start, the focus of the mediator's efforts have

17  been on the settlements with the parties lacking the ability to pay (the "ATP

18  Parties") and the Group of 13.  The fact that the ATP Parties settlement and the

19  Group of 13 settlement were completed first is not any indication that those parties

20  were more cooperative in settlement negotiations.  The order of settlements

21  reflects, instead, the decisions by the EPA and water purveyors on which

22  settlements would be addressed first, and which would be addressed later.

23  Applicants have not been recalcitrant in the mediation process and continue to

24  stand ready to engage the EPA and water purveyors in substantive settlement

25  negotiations when they and the mediator are prepared to do so.

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A/72454362.1

## C.    The EPA's Proposed Consent Decree

On October 23, 2007, the EPA lodged a proposed Consent Decree in this action.[4]  The proposed Consent Decree would resolve VOC liability for the Group of 13 based solely on their payment of $4.7 million in 2002 under the G-13 Agreement, and provide them with contribution protection as against Applicants and others.  Even though the G-13 Agreement had the limitations described above, and did not include the EPA as a party, the Consent Decree recites that the $4.7 million paid under that agreement represents the Group of 13's "fair share" of the total projected VOC costs "at the time of payment," justifying the Group of 13's complete absolution.  Tuggy Decl. Ex. G.

In addition to resolving VOC liability, by entering into the Consent Decree, a subset of ten of the Group of 13 (the "Group of 10") would resolve its perchlorate liability under the ESD and receive contribution protection for that as well.  The Group of 10's consideration for settling its perchlorate liability is $3.4 million, and the EPA claims that, based on their allocations, this represents the Group of 10's "fair share" of perchlorate cleanup costs.  Tuggy Decl. Ex. G at I.G.

Applicants did not learn of the terms of the proposed Consent Decree until the EPA published notice of the Consent Decree in the Federal Register on November 8, 2007 ("Notice").  72 Fed. Reg. 63185 (Nov. 8, 2007).  The Notice provided for a thirty-day public comment period.  Applicants submitted "Comments" to the United States Department of Justice expressing their concern that the proposed Consent Decree and the EPA had provided virtually no information upon which to evaluate the fairness, reasonableness and appropriateness of the proposed settlements, and that as a consequence, their ability to comment was necessarily extremely limited.

---

[4] The EPA has also lodged with the Court a proposed Consent Decree in the case *United States v. Abercrombie*, et al., No. 2:07-cv-06870 ABC.  Although that Consent Decree is not the subject of this motion, Applicants do not thereby waive their right to challenge the *Abercrombie* proposed Consent Decree.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE
A/72454362.1

1   In their Comments, Applicants contended that the EPA's allocations of the

2 "fair share" of cleanup costs were neither disclosed in, nor supported by, the

3 information the EPA published in connection with the proposed Consent Decree.

4 The type of information the EPA should have provided, but did not, include (1) the

5 total cleanup cost for the SEMOU, (2) allocation methodology, (3) the allocations

6 of the Group of 13, (4) orphan shares, (5) whether the "fair share" included any

7 premium, (6) whether the proposed Consent Decree considered any state or federal

8 fund offsets, and (7) whether the proposed Consent Decree took into consideration

9 drinking water rate increases received by the SEMOU Plaintiffs to address

10 contamination within the SEMOU. Tuggy Decl. Ex. H at pp. 2-4.

11   Applicants' Comments further stated that the proposed Consent Decree did

12 not confirm whether the Group of 13's prior payment of $4.7 million was actually

13 paid to the SEMOU Plaintiffs and if so, among other things, how much of that

14 money was spent on performing VOC cleanup under the IROD. *Id.* at p. 5.

15 Furthermore, Applicants noted that the proposed Consent Decree appeared to rely

16 on an unpublished Cooperative Agreement, but then indicated that that document

17 was still being negotiated. *Id.*

18   Fearing that the EPA would not voluntarily disclose any of this information,

19 one of the Applicants (on behalf of the rest) served a Freedom Of Information Act

20 ("FOIA") request on the EPA on December 7, 2007, asking that the information be

21 produced. On February 19, 2008, the EPA provided Applicants with some of the

22 information they requested, such as the EPA's current estimates of cleanup costs, a

23 general description of the allocation methodology, and the EPA's allocations to the

24 Group of 13 and the Group of 10 settling their perchlorate liability. The EPA,

25 however, failed to provide other information that is necessary to determine whether

26 the allocations are fair and reasonable, including (a) the amount of the large

27 unfunded shares that are being allocated to Applicants and not to the Group of 13;

28 (b) the specific allocations for each settling party; and (c) a sufficiently specific

1   allocation methodology to allow it to be replicated reliably by Applicants.  In light

2   of the EPA's failure to address Applicants' objections and comments adequately,

3   Applicants must intervene in this action to protect their rights.

4       Entry of the proposed Consent Decree would have two direct adverse effects

5   on Applicants:  (1) the Consent Decree would unfairly allocate to Applicants as a

6   group more than their fair share of liability for VOCs and perchlorate cleanup, an

7   allocation that would prejudice their ongoing good faith attempts to resolve their

8   disputes with the EPA and the SEMOU Plaintiffs; and (2) the Consent Decree

9   would use these inequitable and unfair allocations to extinguish Applicants'

10  contribution rights against the members of the Group of 13, who are each third

11  party defendants in the SEMOU Litigation.

12  **III.    ARGUMENT**

13      **A.    Applicants Are Entitled To Intervention As A Matter Of Right**

14      CERCLA's plain language allows Applicants to intervene in this action as a

15  matter of right.  Under CERCLA, "any person may intervene as a matter of right"

16  in any action commenced under CERCLA

17        when such person claims an interest relating to the subject

18        of the action and is so situated that the disposition of the

19        action may, as a practical matter, impair or impede the

20        person's ability to protect that interest, unless the

21        President or the State shows that the person's interest is

22        adequately represented by existing parties.

23  42 U.S.C. § 9613(i) (CERCLA Section 113(i)).  CERCLA provides for

24  intervention in terms nearly identical to Federal Rule of Civil Procedure Rule

25  24(a)(2).[5] *California Dep't of Toxic Substances Control v. Commercial Realty*

26  [5] Rule 24(a) of the Federal Rules of Civil Procedure also allows non-parties to
intervene in a pending action as a matter of right upon "timely application" (1)

27  when a statute of the United States confers a conditional right to intervene; or (2)
when the applicant claims an interest relating to the property or transaction which

28  is the subject of the action and the applicant is so situated that the disposition of the

1  *Projects, Inc.*, 309 F.3d 1113, 1118 (9th Cir. 2002).  As a result, the same standards

2  that apply to intervention under Rule 24(a) apply to CERCLA Section 113(i), with

3  one exception: in motions to intervene under CERCLA 113(i), the *Government*

4  bears the burden of showing that existing parties adequately represent the

5  prospective intervenor's interests.  *Id.* at 1118-1119.

6       Thus, under CERCLA Section 113(i), the party seeking intervention must

7  satisfy a three-part test: (1) submit a timely application; (2) have a significant

8  protectable interest relating to the property or transaction which is the subject of

9  the action; and (3) be situated such that without intervention the disposition of the

10  action, may, as a practical matter, impair or impede its ability to protect its interest.

11  *Id.* at 1119.  To overcome intervention, the Government has the burden to show

12  that the interest is adequately protected by existing parties.  *Id.*  The rules

13  governing intervention traditionally have received a liberal construction in favor of

14  potential intervenors and indicate that courts should be "guided primarily by

15  practical and equitable considerations."  *Donnelly v. Glickman*, 159 F.3d 405, 409

16  (9th Cir. 1998); *see also United States ex rel. McGough v. Covington Techs. Co.*,

17  967 F.2d 1391, 1394 (9th Cir. 1992) ("Generally, Rule 24(a)(2) is construed

18  broadly in favor of proposed intervenors and we are guided primarily by practical

19  considerations.").

20       This Court should permit Applicants to intervene because (1) Applicants

21  timely filed for intervention; (2) Applicants have significant protectable interests in

22  the subject matter of this case; (3) those interests would be impaired by the entry of

23  the proposed Consent Decree; and (4) those interests are not adequately protected

24  by the existing parties.

25

26

27  action may as a practical matter impair or impede the applicant's ability to protect
    that interest, unless the applicant's interest is adequately represented by existing

28  parties. Fed. R. Civ. P. 24(a).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A/72454362.1

### 1.   Applicant's Motion For Intervention Is Timely

This motion is timely because Applicants moved for intervention before answers were filed, without delay, and without prejudice to any of the parties in the action. Three factors are relevant to the "timeliness" of a motion to intervene: (1) the stage of the proceedings at which an applicant seeks to intervene; (2) the prejudice to other parties from the applicant's delay in seeking leave to intervene; and (3) the reason for and length of delay. *Commercial Realty*, 309 F.3d at 1119; *Covington Technologies Co.*, 967 F.2d at 1394. Timeliness is to be determined from all the circumstances. *Covington Technologies Co.*, 967 F.2d at 1395.

In *United States v. ExxonMobil Corp.*, No. 07-00060, 2007 WL 4563490, *1 (D.N.H. Dec. 20, 2007), the court found timely a motion to intervene under CERCLA Section 113(i) and FRCP Rule 24(a) where a nonparty sought intervention after it first went through the process of filing comments to the consent decree in response to the notice published in the Federal Register. *ExxonMobil Corp.*, 2007 WL 4563490, at *2. That court found it was reasonable for the applicant to intervene "so that it might formally object to entry and approval of the Consent Decree once Defendants have so moved" after its initial "objections apparently went unheeded." *Id.* at *2-3; *see also United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1181-82 (3rd. Cir. 1994) (considering as timely motion for intervention made soon after the filing of the Consent Decree with the court, particularly in light of the totality of circumstances whereby the potential intervenor took all reasonable steps to protect its interests).

As in *ExxonMobil*, Applicants have taken all reasonable steps to protect their interests, all of which have been unsuccessful, before being forced to move to intervene. Although Applicants were aware that the EPA was negotiating with various groups of PRPs, they were not part of those negotiations, were not invited to participate in those negotiations and were unaware of their nature. Thus,

1   Applicants saw the terms of the proposed Consent Decree for the first time when

2   notice was published in the Federal Register.  Applicants timely submitted

3   objections and comments to the proposed Consent Decree on December 7, 2007,

4   following the requirements set forth in the Notice and in CERCLA Section

5   122(d)(2), which expressly allows nonparties to lodge objections to a proposed

6   consent decree with the Attorney General.  Applicants further served FOIA

7   requests to obtain information necessary to consider the merits of the Consent

8   Decree. Tuggy Decl. ¶ 2.  The EPA informed Applicants on January 25, 2008, that

9   it would soon be moving this Court to approve and enter the Consent Decree, even

10  though the EPA had not responded in any way to Applicant's "Comments" to the

11  proposed Consent Decree. Tuggy Decl. ¶ 3.  Between that date and February 27,

12  2008, Applicants met and conferred with EPA regarding the necessity for this

13  motion to intervene. *Id.*  This motion was filed within one week after the meet and

14  confer ended.

15          Because Applicants have not delayed in bringing this motion, there can be

16  no prejudice to the EPA or the Group of 13 under the second factor of the test,

17  which is prejudice to existing parties *as a result of the delay.*  Furthermore, in light

18  of how long it has taken to negotiate the settlement at issue, the EPA and Group of

19  13 cannot argue any prejudice from the timing of the filing of this motion.  The

20  Group of 13 (without the EPA) entered into the G-13 Agreement in 2002, the Court

21  stayed the SEMOU Litigation for settlement negotiations in 2004, and the Consent

22  Decrees were lodged in late 2007.  Applicants have filed this motion only a few

23  months after the EPA lodged the Consent Decree.

24          **2.      Applicants Have Legal Interests That Support Intervention**

25          Applicants satisfy the second prong of the test for intervention because they

26  have an interest in (1) ensuring that the proposed Consent Decree is based on a fair

27  and reasonable allocation of liability and (2) protecting their rights to contribution.

28  These are interests that courts have recognized as "significantly protectable" and

---

11

1  sufficient for intervention. *United States v. Union Electric Co.*, 64 F.3d 1152,

2  1167-68 (8th Cir. 1995).

3      An intervenor has a "significantly protectable interest" in an action if (1) it

4  asserts an interest that is protected under some law, and (2) there is a "relationship"

5  between its interest and the claims at issue. *California ex rel. Lockyer v. United*

6  *States*, 450 F.3d 436, 441 (9th Cir. 2006); *Arakaki v. Cayetano*, 324 F.3d 1078,

7  1084 (9th Cir. 2003). The "interest test" is "primarily a practical guide to

8  disposing of lawsuits by involving as many apparently concerned persons as is

9  compatible with efficiency and due process." *County of Fresno v. Andrus*, 622

10 F.2d 436, 438 (9th Cir. 1980). Thus, the Ninth Circuit has "taken the view that *a*

11 *party has sufficient interest for intervention purposes if it will suffer a practical*

12 *impairment of its interests as a result of the pending litigation.*" *California ex rel.*

13 *Lockyer*, 450 F.3d at 441 (emphasis added) (allowing intervention of health care

14 providers who did not seek to protect any of their existing legal rights but whose

15 practices would be affected by a suit challenging the constitutionality of a health

16 care law).

17          a.    **Applicants' Interest In A Fair And Reasonable**
                  **Consent Decree Is Sufficient For Intervention**

18

19      Here, Applicants meet the "interest test" because they are asserting legally

20 recognized interests that are directly related to the EPA's imminent motion to enter

21 the Consent Decree. Consent decrees must be fair, reasonable and carry out the

22 goals and objectives of CERCLA. *United States v. Montrose Chem. Corp. of Cal.*,

23 50 F.3d 741, 743 (9th Cir. 1995). A non-settling PRP's interest in the "fairness" of

24 the allocations upon which a consent decree are based is recognized as "legally

25 protectable and otherwise sufficient support" for intervention. *See Union Elec.*

26 *Co.*, 64 F.3d at 1168 (finding that an intervenor's challenge to the fairness of an

27 allocation formula in a consent decree is a protectable interest). Applicants have a

28 significantly protectable interest in ensuring that the allocation "formula" of the

---

12

1   Consent Decree, which in effect allocates less than $9 million of a projected $87

2   million to the Group of 13 is fair and reasonable.

3          A District Court has an obligation to scrutinize the terms of a consent decree

4   to ensure its terms are fair and reasonable. *Montrose Chem. Corp.*, 50 F.3d at 747.

5   The Court can do this here only if the EPA provides sufficient evidence in support

6   of the proposed Consent Decree.  The EPA has failed to do so.  First, it has not

7   provided evidence to indicate the size of the unfunded share that the EPA seeks to

8   shift to the parties who have not yet settled.  Second, the EPA has not provided

9   enough evidence for Applicants to replicate the allocation methodology used in this

10  settlement and, at the very least, should have identified the specific data set and the

11  particular groundwater wells that were used from the SEMOU in determining

12  liability allocation so that Applicants could verify the reasonableness of the use of

13  that data.  The EPA's statement to the effect that whatever data they used is

14  appropriate is inadequate to support the proposed Consent Decree without more

15  and, accordingly, the Court does not have sufficient evidence to properly scrutinize

16  the proposed Consent Decree. *See id.* (rejecting Government's argument that a

17  court can compensate for its lack of information by relying on the

18  recommendations of the special master assigned to supervise settlement

19  negotiations).  Applicants have identified a number of ways described below that

20  make it clear that the Consent Decree is neither fair nor reasonable, and therefore

21  Applicants motion to intervene should be granted.

22              **(1) It Is Neither Fair Nor Reasonable To Shift
                    Allocation Of Orphan And Fugitive Shares
23                  From The Group Of 13 To Non-Yet-Settled
                    Parties**

24

25          The Consent Decree fails to allocate any portion of the unfunded share,

26  which the EPA has informed Applicants likely exceeds a 50% share in this

27  operable unit, to the Group of 13.  But the EPA's attempt to shift the unfunded

28  share to other PRPs, potentially including Applicants, offends basic notions of

---

13

1   fairness because those shares should be equitably apportioned among all of the

2   solvent responsible parties. *See Charter Tp. of Oshtemo v. American Cyanamid*

3   *Co.*, 898 F. Supp. 506, 509 (W.D. Mich. 1995) ("[T]here appears little legitimate

4   reason to force defendant PRPs to bear the entire equitable share of insolvent

5   PRPs. It appears much more equitable to apportion the orphan shares to all the

6   PRPs . . . according to their relative equitable share.").

7       The EPA's *only* justification for this unjust result is the Group of 13's

8   purported "early" settlement with the EPA. This makes no sense. The G-13

9   Agreement did not even purport to release the Group of 13 from liability for

10   unfunded shares. The Group of 13 remained liable for those costs after the

11   standstill period. More importantly, the EPA was not a party to the G-13

12   Agreement and that agreement cannot be characterized as an early settlement with

13   the EPA. There is no rational basis upon which the EPA in 2007 should adopt the

14   $4.7 million payment made by the Group of 13 to the water purveyors in 2002

15   under the G-13 Agreement as a basis for a complete absolution of the Group of

16   13's CERCLA liability, including their liability for the massive unfunded share the

17   EPA now intends to visit exclusively on the not-yet-settled parties. Accordingly,

18   the EPA's justification is unreasonable to the extent it seeks to burden Applicants

19   based merely on their "position in the litigation daisy-chain." *SC Holdings, Inc. v.*

20   *A.A.A. Realty Co.*, 935 F. Supp. 1354, 1373 (D.N.J. 1996) (quoting the brief of the

21   United States) ("'CERCLA should not be interpreted to yield a result which

22   allocates costs for orphaned shares to a particular party based on its position in the

23   litigation daisy-chain.'").

24                   **(2) EPA Has Not Yet Provided Sufficient**

25                       **Information To Determine Whether The Group**
                    **Of 13's Allocation Is Fair And Reasonable**

26       The record to support a Consent Decree embodying a CERCLA settlement

27   must reflect the *detailed* factors that the EPA considered in agreeing to the

28   settlement, and explain the calculation of each settling party's equitable share. *See*

1  *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 907 (E.D. Wis.

2  2004) (approving a consent decree where plaintiffs devoted eleven pages to

3  detailing the factors the parties took into account in agreeing to the settlement,

4  including explaining how they calculated the PRP's share of the total damages).

5  Here, however, the EPA has failed to provide a meaningful explanation of how it

6  has allocated liability.  Indeed, despite an Applicant's FOIA requests for this

7  information, the EPA has refused to produce either the specific data sets for its

8  allocations or the allocations attributed to each of the Group of 13.  The EPA's

9  refusal to provide information such as the specific data set and the particular

10  groundwater wells used by the EPA prevents Applicants, and this Court, from

11  independently determining whether the Group of 13's initial allocation, much less

12  an allocation appropriate as of 2007, is fair and reasonable.

13
14
15

### (3) The EPA's Failure To Assign Orphan Shares To The Group of 13 And To Adequately Support Its Allocation Directly Affects Applicants' Interests

Applicants' interest in a fair and reasonable Consent Decree is directly

16  related to the subject of this action.  If the Consent Decree is not fair and

17  reasonable, then Applicants may be unfairly allocated more than their fair share of

18  liability at the SEMOU and their existing contribution rights against the Group of

19  13 may be extinguished.  The SEMOU Litigation and the instant case both involve

20  the same operable unit, alleged contamination, potentially responsible parties and

21  issues regarding proper allocation of past and future response costs.  Not only do

22  both actions involve a common nucleus of operative fact and law, but the actions

23  are factually and legally intertwined.  The proposed settlement allocating liability

24  at the SEMOU for certain PRPs unquestionably is related to the allocation of

25  liability for the remaining PRPs.  Accordingly, Applicants meet the burden of the

26  "interest test."

27
28

15

1

**b.    Applicants' Interest In Protecting Their CERCLA
Contribution Rights Is Sufficient For Intervention**

2

3
Although no Ninth Circuit opinion has directly addressed whether an

4
applicant's CERCLA contribution rights qualify as a "significantly protectable

~~interest," the Eight Circuit has squarely held that such rights are indeed sufficient~~

5
for intervention.  In *United States v. Union Electric Co.*, the Eighth Circuit held

6
that CERCLA contribution rights are sufficient to merit intervention because they

7
are "direct," "substantial" and "legally protectable."  *Union Elec. Co.*, 64 F.3d at

8
1161, 1166-67.

9
In *Union Electric*, the Eighth Circuit reversed the District Court's denial of a

10
motion to intervene where the lower court acknowledged the legal standards for

11
intervention but then failed to apply those standards, focusing instead on an

12
analysis of CERCLA's policy of fostering prompt settlement.  *Id.* at 1158.  PRPs

13
who declined to join a consent decree proposed by the EPA brought the motion to

14
intervene, claiming the allocation formula "grossly overstated" their liability

15
because it did not allocate response costs in a way that reflected the comparative

16
liabilities of the various PRPs and did not correlate costs of remedial action with

17
contaminants contributed by the parties.  *Id.* at 1155.  The Eighth Circuit found that

18
CERCLA Section 113(f)(1) created an interest in contribution on the part of the

19
PRPs that was directly related to the subject matter of the litigation because it arose

20
from the liability or potential liability of persons as a result of that litigation.  *Id.* at

21
1166.  The court thus held, that "[c]ontrary to the arguments of the EPA and

22
settling PRPs here, it is *precisely because*" a settlement under Section 113(f)(2)

23
"would cut off the interest established by § 113(f)(1) that the non-settling PRPs

24
have an interest in the present litigation sufficient to warrant intervention."  *Id.* at

25
1166-67 (emphasis added).  Therefore, the "threat of cutting off contribution rights

26
of non-settling PRPs creates a direct and immediate interest on the part of non-

27
settling PRPs in the subject matter of the present litigation."  *Id.* at 1167.

28

16

1     Other courts agree. In *United States v. Acton Corp.*, 131 F.R.D. 431 (D.N.J.

2  1990), the court rejected the Government's contention that any contribution rights

3  belonging to non-settling PRPs would be contingent on whether the consent decree

4  was actually approved or on whether the non-settling PRPs were eventually found

5  liable for more than their "fair share." Rather, the court held that the intervenor's

6  rights were not contingent simply because the intervenors might subsequently lose

7  their right of contribution against the settling defendants after entry of the consent

8  decree. *Acton Corp.*, 131 F.R.D. at 434. Further, the court elaborated on this

9  Catch-22 for non-settling PRPs: "Under the Government's theory, non-settling

10  [PRPs] could not seek contribution against the PRPs who are signatories to an

11  unapproved consent order, on the grounds that the non-settlors' interest is

12  contingent; once the consent decree were approved, however, non-settlors would

13  be barred from seeking contribution under § 113(f)(2)." *Id.*[6]

14     Very recently, the District Court of New Hampshire followed the Eighth

15  Circuit's decision in *Union Electric* that an interest in contribution claims is

16  sufficiently protectable to allow intervention as a matter of right by a PRP who has

17  yet to settle. *ExxonMobil Corp.*, 2007 WL 4563490, at *3. That court also rejected

18  the argument that the thirty-day period for public comment under CERCLA

19  Section 122(d)(2) provides nonparties with their only opportunity to challenge a

20  proposed consent decree. *Id.* The *ExxonMobil* court ultimately held that because

---

[6] Some district courts have found that a non-settling PRP's contribution interest by itself does not generate a right of intervention. *See, e.g., United States v. Acorn Eng'g Co.*, 221 F.R.D. 530 (C.D. Cal. 2004). Such courts, however, have been strongly criticized for unnecessarily relying on the legislative intent and policy behind CERCLA as the primary considerations in the analysis of whether to permit intervention under Section 113(i). *See Union Elec.*, 64 F.3d at 1166 ("Although Congress has identified a number of factors as relevant to intervention in CERCLA litigation pursuant to § 113(i), policy and legislative intent are not among them."); *ExxonMobil Corp.*, 2007 WL 4563490, at *3 (noting that by resorting to a legislative intent analysis, these courts have disregarded the plain language of Section 113(i) and "have avoided the more fact-intensive inquiry into the nature of a putative intervenor's contribution claim and how such a claim would be affected by the proposed consent decree"); *accord In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) (policy considerations, although relevant to permissive intervention, have no place in analysis of a claim to intervention as of right).

1   the intervenor had a significant interest in objecting to the consent decree in that

2   matter, it "should have a seat at the table, and an opportunity to speak its piece."

3   *Id.* at *5.

4        Applicants have a statutory right to contribution from the Group of 13 under

5   Section 113(f) of CERCLA, which provides:

6             Any person may seek contribution from any other person

7             who is liable or potentially liable under section 9607(a) of

8             this title, during or following any civil action under

9             section 9606 of this title or under section 9607(a) of this

10            title.

11  42 U.S.C. § 9613(f)(1).  As the *Union Electric* court explained, "CERCLA § 113(f)

12  itself provides for legal protection of the interest in the primary litigation by

13  providing for contribution claims." *Union Elec.*, 64 F.3d at 1166.

14       Not only are Applicants' contribution rights established and protected by

15  CERCLA, those rights are directly related to the subject of this action because the

16  proposed Consent Decree may extinguish Applicants' contribution rights against

17  the Group of 13 in the SEMOU Litigation.  The proposed Consent Decree declares:

18            by entering this Consent Decree this Court finds that

19            Settling Defendants are entitled, as of the date of entry of

20            this Consent Decree, to protection from contribution

21            actions or claims as provided by Section 113(f)(2) of

22            CERCLA, 42 U.S.C. § 9613(f)(2), for "matter addressed"

23            in this Consent Decree.  The "matters addressed" in this

24            Consent Decree as to all Settling Defendants are the

25            IROD Work, Past Response Costs, and Future IROD

26            Response Costs.

27  Tuggy Decl. Ex. G ¶ 22.

28       The fairness of a proposed consent decree should be viewed from the

---

18

1   standpoint of both signatories and non-parties to the decree. *United States v.*

2   *Cannon Eng'g Corp.*, 720 F. Supp. 1027, 1040 (D. Mass. 1989). While the effect

3   on non-parties may or may not be determinative of the court's evaluation, "it

4   should be considered." *Id.* Accordingly, Applicants should be allowed to

5   intervene to present their side before their statutory contribution rights against the

6   Group of 13 are compromised by the Consent Decree.

7   **3.   A Good Faith Settlement Hearing Is Not A Sufficient
             Forum For Applicants To Adequately Protect Their
8            Interests From Being Impaired**

9   Applicants' interests undoubtedly will be impaired by the entry of the

10  proposed Consent Decree. Absent intervention, there is no other adequate way for

11  Applicants to protect their interests because once the Consent Decree is entered

12  Applicants contribution rights will be extinguished. Although the proposed

13  Consent Decree, by its own terms, is contingent on entry and approval of a good

14  faith Order by the Court in the SEMOU Litigation (Tuggy Decl. Ex. G at p. 23)),

15  the good faith settlement hearing will not be an adequate opportunity for

16  Applicants to protect their interests. Applicants' contention, here, that the

17  settlement underlying the proposed Consent Decree is not fair, reasonable or

18  consistent with CERCLA is very different from the issue of whether the settlement

19  was entered into in "good faith."

20  Accordingly, the standards a court uses in determining whether a consent

21  decree is fair and reasonable are widely different than those used to determine

22  whether a settlement was conducted in good faith. Specifically, a court reviews a

23  consent decree to determine whether it is reasonable, procedurally and

24  substantively fair, and consistent with the purposes of CERCLA. *Montrose Chem.*

25  *Corp.*, 50 F.3d at 747. In contrast, the test for determining "good faith" is much

26  more imprecise and subjective, and the court simply must determine whether the

27  settlement amount is within the "reasonable range" of the settling defendant's share

28  of liability. *Tech-Bilt, Inc. v. Woodward-Clyde & Assoc.*, 38 Cal. 3d 488, 499

1   (1985). That is, whereas a nonparty can successfully challenge a proposed consent

2   decree on the ground that the Government has not presented sufficient evidence to

3   support it, a nonparty challenging the good faith of a settlement must demonstrate

4   that the settlement is so far "out of the ballpark" as to be inconsistent with the

5   equitable objectives of encouraging good faith settlements -- a much more onerous

6   burden. *Id.* at 499-500. To recap, the EPA has failed to provide sufficient

7   evidence to justify the Group of 13's allocation. It also seeks to cut off Applicants'

8   right to bring a multi-million dollar contribution claim against the Group of 13.

9   Finally, it shifts all responsibility from the Group of 13 to not-yet-settled parties for

10  millions of dollars in unfunded shares. These acts all have different potential

11  outcomes when viewed in the light of whether the settlement was "procedurally

12  and substantively fair," versus whether the settlement was "out of the ballpark" of a

13  reasonable settlement.

14          Accordingly, the contingency of the Consent Decree on the good faith

15  settlement determination does not adequately protect Applicants' interests and

16  Applicants should be allowed to intervene. While a potential intervenor should not

17  have veto power over a final settlement, it "should have a seat at the table, and an

18  opportunity to speak its piece." *ExxonMobil Corp.*, 2007 WL 4563490, at *5.

19  Forcing Applicants to litigate these issues in a forum where some of their

20  arguments will be ignored and substantially more onerous standards will be applied

21  does not provide Applicants with a seat at the table. Thus, it is necessary for

22  Applicants to be involved in the approval process to ensure that their rights to a fair

23  and reasonable Consent Decree and to contribution are not impaired.[7]

24

25

26  [7] The provision making the Consent Decree contingent on a good faith settlement
    determination in the SEMOU Litigation is odd because the EPA is not a party to the

27  SEMOU Litigation and it is not clear why the Court adjudicating the good faith
    settlement motion would have any occasion to consider the settlement of the claims

28  asserted by the EPA and the California Department of Toxic Substances Control.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A/72454362.1

### 4. The EPA Cannot Show That Applicants' Interests Are Adequately Protected By Existing Parties

Under CERCLA Section 113(i), the Government bears the burden of showing that Applicants' interests are adequately represented by the existing parties. To carry this burden, the EPA must show: (1) the interests of a present party to a suit are such that it will undoubtedly make all of Applicants' arguments; (2) the present parties are capable of and willing to make such arguments; and (3) Applicants would not offer any necessary element to the proceedings that the other parties would neglect. *Andrus*, 622 F.2d at 438-39. The EPA cannot make that showing here.

It is axiomatic that the EPA, who crafted and put forward the very Consent Decree that Applicants consider to be unfair and unreasonable, does not represent Applicants' particular interests and will not make any arguments on behalf of Applicants. While the EPA may purport to represent the interest of all United States citizens in the clean-up of environmental contamination, Applicants' interests are "narrower and not subsumed by the general interest of the United States in providing for the clean up of polluted sites." *Union Elec. Co.*, 64 F.3d at 1169. That is, Applicants' interests in not losing a right to seek contribution and in not being subjected to excessive liability for the clean up is not shared by the other citizens of the United States. Thus, it cannot be said that the EPA here, by virtue of its overarching duties, adequately represents Applicants' interests. Rather, because of these different interests, the EPA can hardly be expected to litigate with Applicants' interests in mind. *Union Elec. Co.*, 64 F.3d at 1170.

Furthermore, any argument that the public comment procedures that followed the drafting of the Consent Decree provided Applicants with the chance to protect their interests misses the point. The issue is not whether Applicants had any other way of protecting their interests, but whether those interests are protected in this litigation. Fed. R. Civ. P. 24(a)(2); *Union Elec. Co.*, 64 F.3d at 1170. While

A/72454362.1

1   the Government must consider Applicants' comments and objections, it is not

2   required to act on them or actually represent the interests of the authors before this

3   Court. *See* 42 U.S.C. § 9622(d)(2); *ExxonMobil Corp.*, 2007 WL 4563490, at *5.

4   Indeed, Applicants have received no response whatsoever to the Comments they

5   submitted.

6         Nor can it be said that the Group of 13 will adequately represent Applicants'

7   interests. The Group of 13 seeks to cut off Applicants' contribution interests,

8   whereas Applicants seek to prevent the same from happening through entry of

9   what they consider to be an unfair Consent Decree. Therefore, the Group of 13's

10   interests are inherently at odds with those of Applicants. *See ExxonMobil Corp.*,

11   2007 WL 4563490, at *5 (holding that settling PRPs interests "inherently are at

12   odds" with intervenors' interests because of conflict over contribution interest).

13   **B.    In The Alternative, The Court Should Allow Permissive Intervention**

14

15         Even if Applicants are not allowed to intervene as a matter of right, they

16   should be allowed to intervene permissively. Rule 24(b), in relevant part, provides

17   for permissive intervention of parties "[u]pon timely application when an

18   applicant's claim or defense and the main action have a question of law or fact in

19   common." Fed. R. Civ. P. 24(b)(2). As shown above, Applicants meet this

20   requirement because the SEMOU Litigation and the instant case involve the same

21   site, alleged contamination, potentially responsible parties, remedy, cleanup costs

22   and efforts, and the same issue: proper implementation of the remedy and

23   allocation of remediation costs. They are also both pending before this Court.

24         In exercising its discretion, the Court should consider whether "the

25   intervention will unduly delay or prejudice the adjudication of the rights of the

26   original parties." Fed. R. Civ. P. 24(b)(2). As explained above, Applicants'

27   permissive intervention will not delay or prejudice the rights of the existing parties.

28   Importantly, intervention will not delay or in any way impact the remedy that is

1    already taking place at the site.  That remedy has been conducted for years and will

2    continue to be implemented uninterrupted, thus satisfying the intent of CERCLA to

3    protect and preserve public health and the environment.  Applicants are attempting

4    to ensure that the EPA used a fair and reasonable procedure in its settlement

5    negotiations.  Allowing Applicants' to intervene will assist the Court in evaluating

6    the fairness and reasonableness of the proposed Consent Decree.

7    **IV.    CONCLUSION**

8           For the reasons set forth in this Motion, Applicants respectfully request that

9    this Court grant its Motion to Intervene as a matter of right pursuant to CERCLA

10   Section 113(i) and/or Rule 24(a), or in the alternative pursuant to Rule 24(b).

11   DATED:  March 5, 2008            Respectfully submitted,

12                                    HELLER EHRMAN LLP

13

14                                    By: Stephen Tuggy /GJP

15                                    Stephen A. Tuggy

16                                    Attorneys for Defendant
                                      AEROJET-GENERAL CORPORATION

17   DATED:  March 5, 2008            BINGHAM MCCUTCHEN LLP

18

19                                    By: Tiffany Hedgpeth /GJP

20                                    Tiffany R. Hedgpeth

21                                    Attorneys for Defendant
                                      TDY INDUSTRIES, INC. (f/k/a
22                                    TELEDYNE INDUSTRIES, INC.)

23

24

25

26

27

28

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE
A/72454362.1

1

2    DATED: March 5, 2008            McCOLLUM & BUNCH

3

4                                    By: Brad Bunch /GJP
                                     Brad Bunch

5

6                                    Attorneys for Defendants
                                     MARY BRKICH;
7                                    JOAN LINDERMAN,
                                          as Trustee of the Linderman Trust;
8                                    M&T COMPANY;
                                     DON TONKS;
9                                    ROY TONKS;
                                     TONKS PROPERTIES;
10                                   TIME REALTY INVESTMENTS, INC.;
                                          and
11                                   BARRY ZWAHLEN,
                                          Individually and as Trustee of Jack
12                                        Barry Zwahlen Family Trust

     DATED: March 5, 2008            WALSWORTH, FRANKLIN,
13                                   BEVINS & McCALL

14

15                                   By: Stephen Onstot /GJP
                                     Stephen R. Onstot
16

17                                   Attorneys for Defendants
                                     QUAKER CHEMICAL
18.                                  CORPORATION and MULTI
                                     CHEMICAL PRODUCTS, INC.

19

20   DATED: March 5, 2008            BOIS & MACDONALD

21

22                                   By: Jim Macdonald /GJP
                                     Jim Macdonald
23

24                                   Attorneys for Defendants
                                     DEL RAY INDUSTRIAL
25                                   ENTERPRISES, INC., ART WEISS,
                                     INC., ART WEISS, Individually, and
                                     ASTRO SEAL, INC..

26

27

28

---

24

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A/72454362.1

1

2   DATED:  March 5, 2008                    SWAIN & DIPOLITO LLP

3

4                                             By: John Nursall /GJP
                                                  John Nursall
5

6                                             Attorneys for Defendants
                                              MAMMOET WESTERN, INC.
7

8   DATED:  March 5, 2008                    MILES-CHEN LAW GROUP, PC

9

10                                            By: Pat Chen /GJP
                                                  Pat Chen
11
                                              Attorneys for Defendants
12                                            PLASTIC ENGINEERED
                                              COMPONENTS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

A/72454362.1